**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **BURGAN EXPRESS FOR GENERAL,** | : | |
| **TRADING AND CONTRACTING CO.,** | : | **Case No. 2:12-cv-041** |
| *et al.*, | : | |
| | : | |
| **Plaintiffs,** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | |
| **v.** | : | |
| | : | |
| **MARK ANTHONY ATWOOD,** *et al.*, | : | **Magistrate Judge King** |
| | : | |
| **Defendants.** | : | |
| | : | |

## OPINION AND ORDER

### I.  INTRODUCTION

This matter is before the Court on Plaintiffs', Burgan Express for General Trading and Contracting Co. ("Burgan Express") and Mahmoud Mohammad Abbas Hajia Khajah ("Hajia"), Joint Motion for Summary Judgment (Dkt. 6) against Defendants Mark Anthony Atwood ("Atwood") and Wolfpack Security Services, Inc. ("Wolfpack").  Plaintiffs move for summary judgment on their Notice of Foreign Judgment, to execute the Judgment of The Court of First Instance of Kuwait, originally filed in the Ross County Court of Common Pleas and subsequently removed to this Court by Defendants. For the reasons stated below, Plaintiffs' Motion for Summary Judgment is hereby **GRANTED**.

## II. STATEMENT OF FACTS

### A. Factual Background

#### 1. The Parties

Plaintiff, Burgan Express, is a corporation organized under the laws of Kuwait with its principal place of business in Kuwait.  Plaintiff, Hajia, is the owner of Burgan Express as well as a citizen and resident of Kuwait.  In 1993, Hajia initially began operating as a sole proprietorship in Kuwait under the Burgan Express name.  On February 28, 2005, he incorporated Burgan Express in Kuwait.

Defendant Atwood is the owner of Defendant Wolfpack.  Atwood is a resident of Ohio and a 22-year veteran of the U.S. Army, to his retirement in 2001.  Starting in 2002 he worked as a civilian contractor for the U.S. Army, operating in Kuwait.  In 2003, Atwood incorporated Wolfpack in Ohio.  Wolfpack provided refrigeration units to U.S. forces at forward operating bases in Iraq for, among other things, preserving human remains.  The Marine Corps gave Wolfpack several contracts, the proceeds from which Wolfpack spent on vehicles, generator equipment, weapons, and labor costs.

#### 2. The Dispute

Atwood was referred to Hajia as a source of initial capital for his business operations in Iraq.  He alleges that he received a number of "loans" from Hajia, but none after 2003.  Atwood claims to have repaid those loans in full.  Hajia, however, contends that in June 2004 he and Atwood formed a contract for a joint venture between Burgan Express and Wolfpack, the terms of which distributed 51% of the profits to Burgan Express and 49% to Wolfpack.  The contract went into effect on July 1, 2004.  The joint venture was to be based in Kuwait, but serve as a

2

contractor for the U.S. Armed Forces throughout the Middle East.  In Hajia's sworn affidavit, he says this agreement was a joint venture, and not understood by either party to be a loan.  Both Hajia and Atwood agree that disputes relating to their financial relationship arose between them in 2005.  As a result, Atwood, as required by Kuwaiti law, published notices in a Kuwaiti newspaper on October 30, 2005 and November 6, 2005 announcing the termination of "the business relationship" between Wolfpack and Burgan Express.

It should be noted that Atwood, in his affidavit, paints a very different picture of the history of the business relationship between Plaintiffs and Defendants.  Atwood's version, however, was largely rejected by the Kuwaiti courts after voluminous proceedings and is wholly unsupported by any evidence beyond Atwood's sworn statement.  Furthermore, Atwood's affidavit demonstrates that he, whether through ignorance or lack of diligence, simply misunderstood much of what transpired in the Kuwaiti courts.

### 3. The Litigation in Kuwait

Shortly thereafter, on November 9, 2005, Burgan Express initiated a civil action against Atwood and Wolfpack in the Commercial Division of the Kuwaiti Court of First Instance, which is Kuwait's court of original jurisdiction for civil suits worth more than 5,000 Kuwaiti dinars ("KD"), approximately $18,000.00.  In this first action (Kuwait Case No. 4270/2005), Burgan Express sought an order confirming the existence of a joint venture agreement between Burgan Express and Wolfpack, as well as a court valuation of Burgan Express's capital investments and profit entitlements.  On November 12, 2005, Hajia, in his individual capacity, filed a second civil action (Case No. 4284/2005) against Atwood and Wolfpack in the same Court of First Instance, seeking a judgment against the Defendants for unpaid profits and money owed resulting from the

3

joint venture.  The Court of First Instance subsequently consolidated those two cases.  Also in November 2005, Kuwaiti prosecutors brought a criminal charge, which is the Kuwaiti equivalent of embezzlement, against Atwood (Kuwaiti Case No. 1094/2006).  In the two civil actions Atwood was represented by a Kuwaiti agent, Bader Al-Barazi, and an attorney, Al-Otaibi.  The same agent and counsel also represented Atwood in the criminal trial.

Atwood filed pleadings and other motions in his defense in the civil actions and appeared, both personally and through counsel, at numerous hearings during 2006.  The Court appointed an "Expert Committee" to determine the value of the contracts between the alleged joint venture and the U.S. Armed Forces, as well as the capital contributions made by Burgan Express.  On January 24, 2007, the Expert Committee reported the Parties "were bound by a Joint Venture Agreement with no incorporation deed executed."  (Complaint, Exh. A at ¶15).  It also calculated the Plaintiffs' share of the profits as 3,516,529 KD ($12,659,504.40), with Defendants owing the Plaintiffs a total amount of 6,677,257.358 KD ($24,038,126.49).

Defendants objected to the report, causing the Court to appoint a second Expert Committee, with new members, to evaluate the claims once again.  The second Expert Committee reported the "net amount" due the Plaintiffs was 1,974,872.358 KD ($7,109,540.49) while it was unable to calculate the "additional monies" due.  In consideration of the two reports, the Court of First Instance, at a December 31, 2008 hearing, awarded Plaintiffs 4,345,774.385 KD ($15,644,787.79).  Plaintiffs appealed that judgment in January 2009, seeking to increase the amount of the award.  A third Expert Committee was then convened to evaluate the claim on appeal.  On December 20, 2009, the third Expert Committee concluded the amount Defendants owed the Plaintiffs since the commencement of the joint venture on July 1, 2004 until December

4

2009 was 5,610,361.154 KD ($20,197,300.15).  A June 7, 2010 hearing confirmed the award,

but Defendants did not appear, despite having been properly noticed through counsel.

Defendants also failed to appeal the decision to the Court of Cassation, Kuwait's highest court

for commercial suits, before the appeals deadline of July 14, 2010.

### 4. The Criminal Case in Kuwait

In Atwood's criminal trial for embezzlement, the Court adjudged him guilty of

embezzling monies and equipment from Hajia worth 3,160,728.358 KD ($12,998,622.09).  On

May 29, 2007, The Court sentenced Atwood to term of imprisonment of three years, to be

followed by deportation.  Atwood appealed the verdict on May 30, 2007.  In June 2007 Atwood

voluntarily absented himself from Kuwait and has not returned.  On February 13, 2008, the Court

of Appeal affirmed the verdict of the Court of First Instance for Crimes.  As the instant case is

purely a civil matter, there is no issue of enforcing the criminal verdict.

### 5. Atwood's Allegations Regarding Litigation in Kuwait

Atwood's affidavit also presents a very different account of the litigation than that found

in the records of the Kuwaiti courts.  Atwood claims his Kuwaiti counsel informed him that he

the "Expert Committee had found in [his] favor, and that the case was over."  (Atwood Affidavit,

at 3).  Atwood claims that only a few months after the "dismissal" of the first action was he

informed that a second action had been filed "on the same facts."  (*Id*.)  According to Atwood,

his Kuwaiti agent told him that Hajia "had 'paid off the judges' with a sum equal to several

hundred thousand dollars U.S. to secure the reopening of the case."  (*Id*.)  Atwood says he never

appeared before a judge in the second action, though he admits there were three hearings before

the Expert Committee, prior to the Court of First Instance issuing a judgment against him and

5

Wolfpack.  (*Id.*)  Atwood alleges he "fled" Kuwait in June 2007 following "death threats made by [Hajia]," but that he prepaid his Kuwaiti attorneys to continue his defense in both the civil and criminal cases after his departure.  (*Id.* at 4)

Atwood adds that "upon information and belief" his attorneys ceased defending him after he left Kuwait.  He also admits "upon information and belief" that he was sentenced to three years of imprisonment "for an alleged business debt."  (*Id.* at 4).  Atwood claims he was not informed a judgment had been entered against him until "the summer of 2010" when Bader, his Kuwaiti agent, so informed him.  Atwood reports Bader told him, "You were an American in a Muslim court system in the Middle East – what did you expect?"  Upon information and belief, Atwood also alleges Hajia, pursuant to a Kuwaiti court order, seized equipment from Wolfpack valued at $3.5 million.  He says Wolfpack's profits from its operations in the Middle East totaled approximately $5 million.

Finally, he claims to have been unable to secure documents from Kuwait to verify his account, though he is continuing his efforts through new counsel in Kuwait.  He attached no documents or other evidence in support of his contentions, apart from his sworn affidavit.

**B. Procedural History**

On December 14, 2011, Burgan Express and Hajia filed a Notice of Foreign Judgment in the Ross County Court of Common Pleas, pursuant to O.R.C. 2329.023.  The certified and translated judgment from the Kuwaiti Court of Appeal was attached to the Notice, stating judgment had been entered against Atwood and Wolfpack for $20,283,412.39.

On January 16, 2012, Defendants removed the case to this Court pursuant to 28 U.S.C. § 1441 and 28 U.S.C. § 1332.  Plaintiffs filed this Motion for Summary Judgment on February 23,

2012.  On May 18, 2012, the Magistrate Judge denied the Defendants' Motion for Extension of Time for Discovery because Defendants filed a Response in Opposition to Plaintiffs' Motion for Summary Judgment on May 15, 2012.  On June 19, 2012, the Court set the hearing on Plaintiffs' Motion for Summary Judgment for September 20, 2012.  Subsequently, the Court denied Defendants' Motion for Leave to File a Supplemental Memorandum on September 13, 2012 because Defendants failed to demonstrate good cause.

### III. STANDARD OF REVIEW

Fed.R.Civ.P. 56 provides, in relevant part, that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law." *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir.1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, (1986)).

The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 339–40 (6th Cir.1993). The suggestion of a mere possibility of a factual dispute is insufficient to defeat a movant's motion for summary judgment. *See Mitchell v. Toledo Hospital,* 964 F.2d 577, 582 (6th Cir.1992) (citing *Gregg v. Allen–Bradley Co.,* 801 F.2d 859, 863 (6th Cir.1986)). Further, "summary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.  When a plaintiff, however, invokes summary judgment "and a showing is made by the [plaintiff], the burden rests on the [defendant]

to show that he has a ground of defense fairly arguable and of a substantial character." *Pen-Ken Gas & Oil Corp. v. Warfield Natural Gas Co.*, 137 F.2d 871, 877 (6th Cir. 1943).

The necessary inquiry for this Court in determining whether summary judgment is appropriate is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir.1993) (quoting *Anderson,* 477 U.S. at 251–52). In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962). The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *See Anderson,* 477 U.S. at 251; *Copeland v. Machulis,* 57 F.3d 476, 479 (6th Cir.1995).  Self-serving affidavits, alone, are not enough to create an issue of fact sufficient to survive summary judgment. *Wolfe v. Vill. of Brice, Ohio*, 37 F. Supp. 2d 1021, 1026 (S.D. Ohio 1999).  *See Anderson,* 477 U.S. at 251; *Copeland,* 57 F.3d 476 at 479.

With regard to affidavits, Rule 56 (e) requires that affidavits submitted in support of or in opposition to motions for summary judgment include facts based on personal knowledge and that personal knowledge "must be evident from the affidavit." *Reddy v. Good Samaritan Hosp. & Health Ctr.*, 137 F.Supp.2d 948, 956 (S.D. Ohio 2000).  Thus, "statements made 'on information and belief' are insufficient to satisfy the personal knowledge requirement of Rule 56(e).  *Id.* Affidavits at the summary judgment stage also may also not rely upon inadmissible hearsay because inadmissible hearsay "cannot create a genuine issue of material fact."  *North American Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 83 (6th Cir. 1997).

8

## IV. LAW AND ANALYSIS

Both Plaintiffs and Defendants agree that the recognition and enforcement of foreign judgments are matters of state substantive law.  *Samyang Food Co., Ltd. v. Pneumatic Scale Corp.*, 5:05-CV-636, 2005 WL 2711526, at *5 (N.D. Ohio Oct. 21, 2005).  Here, the governing provision of Ohio law is Ohio Rev. Code § 2329.91 which states, in relevant part:

> [A]ny foreign country judgment that is final, conclusive, and enforceable where rendered shall be recognized and enforced by the courts of this state, even though an appeal from the judgment is pending or the judgment is subject to an appeal. Such a foreign country judgment is enforceable in this state in the same manner as a judgment of another state that is entitled to full faith and credit.

Moreover, the Supreme Court held, in *Hilton v. Guyot*, the seminal case on recognition of foreign judgments:

> [W]here there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason why the comity of this nation should not allow it full effect, the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh, as on a new trial or an appeal, upon the mere assertion of the party that the judgment was erroneous in law or in fact. The defendants, therefore, cannot be permitted, upon that general ground, to contest the validity or the effect of the judgment sued on.

*Hilton v. Guyot*, 159 U.S. 113, 202-03, (1895).  The Court went on to add that it was not prepared to hold a procedural difference "of itself, a sufficient ground for impeaching the foreign judgment." *Id.* at 205.  The Second Circuit further clarified that, "Clear and convincing evidence of fraud is required in order successfully to attack a foreign judgment, just as such proof is necessary before a court will set aside its own judgment."  *Clarkson Co. v. Shaheen*, 544 F.2d

9

624, 631 (2d Cir. 1976). Thus, a "party challenging the validity of a foreign judgment has the burden of presenting evidence of its invalidity." *Samyang*, 2005 WL 2711526 at *5.

The federal courts' limits on recognizing foreign judgments obtained in the absence of due process or by fraud are consistent with the limits of Ohio Rev. Code § 2329.91. That statute, Ohio's partial codification of the Uniform Foreign Judgments Recognition Act, states a foreign country judgment is not conclusive, and therefore not entitled to recognition or enforcement, where the court that rendered it lacked personal or subject matter jurisdiction, or where "judgment was rendered under a system that does not provide impartial tribunals or procedures that are compatible with the requirements of the due process of law." Consistent with the Supreme Court's holding in *Hilton* that procedural differences alone are not grounds for setting aside a foreign judgment, "The Uniform Act and Ohio law do not contemplate that foreign judgments only become enforceable when exact Ohio's procedures are followed. Instead, the statute concerns itself with whether the foreign court offers a fair procedure generally compatible with the due process obligations of notice and opportunity to be heard." *Samyang*, 2005 WL 2711526 at *6. Ohio Rev. Code § 2329.92 specifically states a judgment shall not be recognized under § 2329.91 if:

> **(1)** The defendant in the proceedings in the foreign court did not receive notice of the proceedings in sufficient time to enable him to defend;
>
> **(2)** The foreign country judgment was obtained by fraud;
>
> **(3)** The claim for relief on which the foreign country judgment is based is repugnant to the public policy of this state;
>
> **(4)** The foreign country judgment conflicts with another conclusive and final judgment;

10

**(5)**     The proceedings in the foreign court were contrary to an agreement between the parties under which the dispute in question was to be settled otherwise than by proceedings in that court;

**(6)**     If jurisdiction was based only on personal service, the foreign court was a seriously inconvenient forum for the trial of the action.

Thus, the overall thrust of Ohio and federal law concerning recognition of foreign judgments is that the foreign court's procedures must broadly comport with due process as defined in the United States.  The procedures need not exactly mirror procedures of United States courts, provided the differences do not render the proceedings fundamentally unfair.  To the extent the Plaintiffs make a showing they received a "conclusive judgment" in their favor, the court rendering the judgment properly had jurisdiction, and Defendants received due process, the Defendants must then produce some evidentiary support for their affirmative defenses or demonstrate an actual dispute regarding the evidence supporting the Plaintiffs' factual contentions.

### A.  Elements of Plaintiffs' Burden

### 1.  Conclusive, Final, and Enforceable Kuwaiti Judgment

There is no question that the judgment rendered by the Kuwaiti Court of Appeals is conclusive, final, and enforceable.  In the Court of First Instance, Defendants had the opportunity to appeal the findings of the First Expert Committee, which led to the appointment of the Second Expert Committee.  Although the Second Expert Committee decreased the award recommended by the First Expert Committee, it still found for the Plaintiffs in the amount of approximately $7.1 million.  The Plaintiffs then appealed to the Court of Appeals, where their award was increased to the amount of $20,283,412.39 sought here.  Defendants were represented throughout the first proceeding and did not appear at proceedings before the Court of Appeals despite

11

receiving adequate notice through counsel of record.  The judgment of the Court of Appeals was filed with this Court as an exhibit, as well as a Certificate of Non-filing of Cassation Petition which shows Defendants did not appeal the Court of Appeals' judgment to Kuwait's highest court.  At that time, the judgment became final.  The judgment awarded monetary damages, as is standard in such contract cases in both the United States and Kuwait, and such an award can be enforced by this Court.

### 2.  Kuwaiti Court's Subject Matter Jurisdiction

The Defendants do not contest that the Kuwaiti Court of First Instance and Court of Appeals properly had subject matter jurisdiction.  Additionally, this Court takes judicial notice of Kuwait's Civil and Commercial Pleadings Law, essentially Kuwait's civil code.  Article 34 provides, in relevant part, that the Court of First Instance has preliminary jurisdiction in matters exceeding 5,000 KD (approximately $18,000).  If the matter exceeds 5,000 KD, Article 36 grants appellate jurisdiction to The Court of Appeals.  The value of this suit greatly exceeded 5,000 KD; thus, The Court of First Instance had subject matter jurisdiction and The Court of Appeals properly had jurisdiction over the appeal.

### 3.  Kuwaiti Court's Personal Jurisdiction

The Defendants do not contest that the Kuwaiti Court of First Instance properly had personal jurisdiction over Defendants.  Again, Kuwait's Civil and Commercial Pleadings Law provides the relevant Kuwaiti law.  Article 23 grants Kuwait's courts personal jurisdiction over foreigners domiciled or having place of residence in Kuwait, while Article 24(b) states "The Kuwaiti Courts shall cognize cases brought against a foreigner who has no domicile or place of residence in Kuwait . . . if the case is . . .  relevant to an obligation originated, executed or

12

required to be executed [in Kuwait]." Defendant Atwood was resident in Kuwait at the time the original suit was brought, but even had he not been resident there, the contract giving rise to the suit originated in Kuwait. Moreover, Wolfpack operated out of Kuwait at the time. Thus, the Kuwaiti Court of First Instance had personal jurisdiction over Defendants.

### 4. Notice

Defendants had actual notice of the suit in the Court of First Instance, as evidenced by their multiple appearances before that Court and appeal of the findings of the First Expert Committee. In essence, Defendants fully participated in the litigation in Kuwait at least until the time Atwood voluntarily absented himself from the country. Moreover, Defendants had constructive notice of Plaintiffs' appeal by notice being given to Defendants' counsel of record. Such notice is sufficient under Kuwaiti law.

### 5. Plaintiffs Satisfied Burden Under Section 2329.91

Plaintiffs, by submitting a certified copy of a final judgment from a Kuwaiti court and demonstrating the court rendering that judgment had subject matter and personal jurisdiction, and that Defendant had notice of the suit, have satisfied the requirements of Ohio Rev. Code 2329.91 in order to enforce a foreign country judgment. Those material facts are not in dispute, particularly in light of Plaintiffs' documentary evidence. The burden then shifts to Defendants to raise an issue of material fact which is central to the Plaintiffs' case.

### B. Affirmative Defenses

### 1. Lack of Due Process

Kuwait's justice system is not identical to that of the United States, but like the United States' legal system, it evolved from the Common Law of the British Commonwealth. While

some of its procedures differ from those of American courts, there is no evidence in the record to suggest the Kuwaiti courts denied Defendants due process.  The certified judgment of The Court of Appeals clearly shows Defendants were represented by Kuwaiti counsel throughout the adversarial proceedings in The Court of First Instance.  In fact, the Defendants appealed the findings of the First Expert Committee and won a downward revision of the Plaintiffs' award from a Second Expert Committee, though it still found for Plaintiffs in the amount of 1,974,872.358 KD ($7,109,540.49).

Although Defendants contest Plaintiffs' assertion that Defendants were "represented at all appellate proceedings," the dispute of fact is not material because Defendants did receive due process.  Atwood fled Kuwait after a criminal verdict, following a proceeding in which he was represented, sentenced him to three years imprisonment.  Atwood had sought the protection of Kuwaiti laws in the civil proceedings with Plaintiffs; then he chose to flaunt Kuwaiti laws after losing his criminal case.  It is, at best, disingenuous for Atwood to contest the decision of The High Court of Appeals on the grounds he did not appear before it, as he was voluntarily a fugitive from Kuwait's justice system at the time.  Moreover, even in the United States, a defendant does not have a constitutional right to legal counsel in a civil proceeding.  *Lassiter v. Department of Social Services of Durham County, N.C.*, 452 U.S. 18, 26-7 (1981).

The allegations in Atwood's affidavit and Response in Opposition to Plaintiffs' Motion for Summary Judgment do not indicate a dispute of material fact, but rather a fundamental lack of understanding of the litigation in Kuwait through either sincere or willful ignorance.  Defendants allege that there were two separate suits in Kuwait based on substantially the same facts, whereas the judgment of The Court of Appeals clearly states that there were two actions

14

filed, one by Burgan Express and the other personally by Hajia, based on different causes of action and seeking different relief.  Since both actions related to the same joint venture with Atwood and Wolfpack, the Court of First Instance joined the actions.  Moreover, the fact that Kuwaiti courts refer complex damages calculations to expert committees whose findings must be approved by the courts does not mean Defendants did not receive due process.  In the United States' justice system, it is not uncommon for questions of liability to be decided separately from questions of damages, even by different finders of fact.  Suffice to say, the Defendants self-interested allegations do not raise material questions as to whether Defendants received due process when compared with the certified judgment of The Court of Appeals.  In light of the evidence that the Defendants actually received due process, the Court need not address Defendants' unsupported argument that the Kuwaiti justice system "systemically" fails to provide due process.

## 2.  Fraud

Since fraud is an affirmative defense, the burden is on Defendants to "show that [they have] a ground of defense fairly arguable and of a substantial character."  *U.S. v. General Motors Corp.*, 518 F.2d 420, 442 (D.C. Cir. 1975).  By Defendant Atwood's own admission, his allegation of fraud rests "upon information and belief."  Even if it were appropriate for this Court to consider statements made "upon information and belief" at the summary judgment stage when Defendants have had opportunity for discovery, the "information" herein is simply hearsay.  Atwood's Kuwaiti representative Bader, allegedly told Atwood that Plaintiffs had paid a bribe to permit the "Second Action."  As explained, *supra*, the second action was filed by Hajia as an individual and subsequently joined by the Court.  The certified judgment of The Court of

15

Appeals explains this clearly and gives no appearance of impropriety.  Furthermore, given that Bader is unlikely to have observed any such bribe, Atwood's allegations of fraud in his affidavit are hearsay which rest upon hearsay.  Simply put, Defendants have put nothing in the record to raise a material question as to the existence of fraud in obtaining the judgment.

### 3.  Repugnant to Public Policy

In arguing that enforcing the judgment of the Kuwaiti courts would be "repugnant to public policy," Defendants offer conclusory legal statements regarding the "injustices" allegedly permitted by Kuwaiti courts.  In the absence of evidence of these "injustices" and considering the presence of a certified Kuwaiti judgment demonstrating due process was provided, Defendants fail to raise any issue of material fact as to the "repugnancy" of the Kuwaiti decision.  To the contrary, given Ohio's commitment to enforcing lawfully obtained foreign judgments, demonstrated by Ohio Rev. Code § 2329.91, it would be repugnant to public policy to allow Defendants unsupported accusations to defeat the Plaintiffs' certified decision.

At oral argument, Defendants' repeatedly mentioned the valuable service Defendants provide to the U.S. in Iraq.  While the Defendants' willingness to risk harm in order to preserve the remains of members of the armed forces is laudable, it is not, of itself, a fact of legal significance.  It does not provide a defense to violation of a contract or flouting of the law of an allied nation which hosted Defendants' business.  In short, these concerns raise no issue of material fact as to whether enforcing the Kuwaiti judgment is repugnant to public policy.

### 4.  Reciprocity

16

Defendants claim it is "unclear" whether Kuwaiti courts enforce judgments from United States' courts, and argue, thus, the Kuwaiti judgment should not be recognized. The governing law, Ohio Rev. Code § 2329.92, states, in relevant part:

> A foreign country judgment rendered in a foreign country that does not have a procedure for recognizing judgments made by courts of other countries . . . substantially similar to sections 2329.90 to 2329.94 of the [Ohio] Revised Code may be recognized and enforced pursuant to section 2329.91 of the Revised Code in the discretion of the court.

Even if Kuwaiti courts lacked a procedure for enforcing foreign judgments, this Court could exercise its discretion to enforce their judgment. This is academic, however, as Kuwait does have just such a procedure, codified in Article 199 of Kuwait's Civil and Commercial Pleadings Law. Article 199 states "[i]t shall be permissible to order the execution of judgments and orders issued in a foreign country inside Kuwait according to the conditions decided . . ." Those "conditions" include the judgment having been "given by a competent Court in conformity with the law of the country wherein it is given," the litigants receiving notice and representation, the judgment having "had the force of the adjudicated order . . . not contradictory to a preceding judgment or order given by a Court in Kuwait and [] not against the ethics or the public order in Kuwait." Defendants argue that these conditions make Kuwait's recognition of foreign judgments "questionable." These conditions, however, are substantially the same as those contained in sections 2329.90 to 2329.94 of Ohio's Revised Code. Kuwait is concerned, as is Ohio, that foreign judgments enforced in its courts are arrived at through due process by a competent authority, and that they are not repugnant to Kuwait's public policy. Thus, the Defendants have not raised an issue of material fact as to whether Kuwait recognizes foreign judgments.

17

### 5. Accord and Satisfaction

Defendants also allege "[u]pon information and belief [Wolfpack's] seized property was turned over to the Plaintiffs to satisfy their judgment." As explained above, however, at the summary judgment stage, this Court does not consider statements made upon information and belief. Sufficient time for discovery has elapsed to allow for better evidence if it exists to be found. Moreover, in this case, Plaintiff Hajia has attached a sworn affidavit, not made solely upon information and belief, that he has "not received any money towards satisfaction of judgment by way of seizure of equipment or through any other means." Additionally, the judgment of the Kuwaiti Court failed to mention any partial satisfaction of its award, lending further credence to the Plaintiff's affidavit. In light of those facts, and that Defendants' only apparent support of this allegation is that "Defense Counsel has been attempting to get in touch with U.S. government personnel who allegedly witnessed this seizure and know the circumstances behind it," there is no material issue of fact as to accord and satisfaction.

### V. CONCLUSION

For the foregoing reasons, the Plaintiffs' Motion for Summary Judgment is hereby **GRANTED**. The Court takes notice of the judgment of the Kuwaiti Court of Appeals and **ORDERS** Defendants to pay Plaintiffs the sum of $19,972,996.07 (at the September 26, 2012 conversion rate of the Kuwaiti award of 5,610,361.154 KD, plus 30 KD in costs and fees).

**IT IS SO ORDERED.**

           **s/ Algenon L. Marbley**
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED: September 26, 2012**

18